**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,
Plaintiff,
vs.
DIANA LEE FLAHERTY,
Defendant.

2:04-CR-0084-RCJ-RJJ

**ORDER**

This matter comes before the Court on Defendant Diana Flaherty's Motion for a New Trial (#181) and Supplemental Motion for a New Trial. (#228.) Defendant contends that a new trial is warranted because: (1) the Court committed errors in excluding evidence; (2) the jury verdict is not supported by the evidence; (3) the Court improperly instructed the jury; and (4) newly discovered evidence shows Defendant is mentally incompetent. The Court has considered the motions, the pleadings on file, and oral argument on behalf of all parties. Defendant's Motions for a New Trial are denied.

**BACKGROUND**

On May 8, 2006, Defendant Diana Flaherty was convicted by a jury of conspiracy to commit securities fraud, mail fraud, and wire fraud in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. § 78j(b); and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Defendant committed these crimes as part of a conspiracy with her late husband, Robert Flaherty, and co-Defendant Michael Gardiner to sell ore

purchase agreements by misrepresenting to investors that (1) volcanic cinders contained valuable metals; (2) the conspirators owned a large supply of cinders; (3) the conspirators had developed the technology to extract gold and other platinum metals from volcanic cinders; and (4) production of precious metals using this technology had begun or was imminent. On July 18, 2006, the Court released Defendant on a personal bond in the amount of $2,000,000 pending her sentencing. Before the Court now is Defendant's Motion for New Trial (#181) and Supplemental Motion for New Trial (#228).

## DISCUSSION

Under Federal Rule of Criminal Procedure 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Defendant contends that justice requires a new trial because: (1) the Court erroneously failed to admit assay reports in Exhibits 501 and 512; (2) the jury verdict is against the great weight of the evidence; (3) the Court failed to adequately instruct the jury regarding materiality; and (4) the Court improperly denied Defendant's Motion for a Mistrial. These arguments are all ultimately unavailing and a new trial is denied.

### I. Motion for a New Trial

#### A. The Court Properly Excluded Exhibits 501 and 512

Defendant first argues that a new trial is necessary because during trial the Court failed to admit assay reports in Exhibits 501 and 512. These exhibits contain multiple assay results of the volcanic cinders performed at the behest of Defendant. These exhibits were excluded by the Court because the preparers of the assays were not available to lay foundation for the reports by testifying regarding their preparation. Defendant contends that

the reports were improperly excluded as hearsay when they fall within a clearly marked exception to the general hearsay rule. She argues that these assays were not offered to prove whether there were in fact precious metals in the volcanic cinders, but rather whether Defendant had a good faith belief of the existence of such metals – thus negating the requisite criminal intent.

Defendant misconstrues the Government's objection and the Court's ruling regarding these exhibits in making this argument. Irrespective of whether the assays fell within an exception to the prohibition against hearsay, a proponent of an exhibit must lay a sufficient foundation to establish "that the matter in question is what its proponent claims." Fed. R. Evid. 901. Furthermore, the District Court acts as a gatekeeper with regard to scientific or technical evidence, "excluding 'bad science' that does not carry sufficient indicia of reliability for admission." *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 840-41 (9th Cir. 2001).

At trial, the Government introduced substantial testimony and evidence regarding independent assays of samples of the volcanic cinders that Defendant and her co-conspirators purportedly possessed. These assays established that the cinders do not contain any appreciable concentrations of gold or other precious metals. Defendant sought to counter this evidence by admitting evidence showing that she had a good faith belief that the cinders possessed precious metals, thereby eliminating her criminal intent to defraud. While the Court granted Defendant broad freedom to explore this defense, it did not allow Defendant to introduce evidence without adequate foundation or the opportunity for cross examination.

Exhibit 512 includes several assay reports prepared by Dr. Donald Jordan for the

Defendant and covers the time span of August 1993 through June 2000. Defendant sought to introduce these assays during cross examination of co-Defendant Gardiner, but Defendant never presented an adequate foundation for the admission of the Exhibit. Furthermore, each of these essays bears the caveat that "These results are based on . . . solely on the samples submitted by customer. This report is prepared for the exclusive use of the customer only." None of the witnesses at trial provided any information regarding the source, nature, or chain of custody of these samples submitted by Defendant to Dr. Jordan. Therefore, the Court acted reasonably in exercising its gatekeeping powers to exclude potentially unreliable and dubious evidence. Defendant was given ample opportunity to present similar assays prepared by Dr. Jordan after laying a proper foundation. *See* Defense Exhibit 509, 510; Government Exhibit 17.

Exhibit 501 also contains numerous assay reports and was prepared by Rocky Mountain Geological. It covered a time span of May 2000 through January 2002. Again, these reports were created at the request of Defendant and her co-conspirators. At trial, Defendant sought to introduce Exhibit 501, but did not present testimony or other evidence authenticating the assays. During oral argument over the admissibility of the assays, defense counsel informed the Court that it intended to call Irving Weinberger as a witness to authenticate the Rocky Mountain Geological reports. The Court ruled that Defendant would be allowed to introduce selected samples of the assay reports if Mr. Weinberger provided ample foundation and authentication. Although Mr. Weinberger was available to testify at trial, even appearing at the courthouse in response to a defense request, the defense ultimately failed to call him as a witness. As Defendant failed to take advantage of its opportunity to

authenticate the assays in Exhibit 501, it cannot now claim that those reports were improperly excluded.

This Court properly excluded the assay reports in Exhibits 501 and 512 because the Defendant failed to lay a proper foundation for them. Accordingly, this exclusion provides no grounds for a new trial under Rule 33.

**B. The Jury's Verdict is Supported by the Evidence**

Defendant also moves for a new trial claiming that the evidence weighs heavily against the verdict. A court may grant a new trial "[i]f, giving full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987). In making this determination, the Court need not view the evidence in the light most favorable to the prevailing party. *Id.* In reviewing the trial record, the Defendant offers a skewed and incomplete picture of the evidence submitted by both parties in the case. While the Court will not retry the case through post-trial motions, the trial record will be briefly revisited to show that the evidence overwhelmingly supported the jury verdict in this matter.

In reviewing testimony from the trial, Defendant only highlights those witnesses or documents that support her case. Her review of the record is thus unhelpful and incomplete. She discredits witness after witness as "unbelievable" and paints a biased version of the facts that completely removes her from any fraudulent dealings. For example, Defendant argues that co-Defendant Gardiner offered no testimony regarding him making an agreement with Defendant to commit fraud. She also claims that Gardiner's admissions regarding his

fraudulent activities never implicated Defendant in the scheme. The evidence submitted at trial reveals that Defendant was actively involved in the fraudulent schemes. In reproducing Gardiner's testimony, Defendant fails to mention Gardiner's testimony regarding Defendant's role in the enterprise and the misrepresentations she made to him. Similarly, Defendant fails to note the audio recordings in which Defendant advised Rudy North that she, and not her ex-husband, was in charge of the business, that Gardiner was a member of her team, and that she instructed Gardiner regarding the promotional presentation of Phoenix Metals. She also fails to reference additional audio recordings in which Defendant and Gardiner combined to promote and attempt to sell Phoenix Metals stock to witness James Whitemore in early 2002. Numerous additional testimonial and documentary evidence could be cited to demonstrate Defendant's active involvement in the conspiracy and its illegal activities.

Defendant further contends that even if her ex-husband and their business entities were involved in fraudulent dealings, she lacked the requisite criminal intent because she had a good faith belief that the conspirators owned the volcanic cinders, that the cinders contained valuable minerals, and that the conspirators possessed proprietary technology capable of extracting metals from the cinders. This good faith defense ultimately failed scrutiny as the evidence showed that Defendant had been repeatedly informed that the volcanic cinders did not contain any commercially recoverable metals. Indeed Dr. Ralph Pray, the 900 Capital Services lawsuit, the SEC injunction, and the Bureau of Land Management all placed Defendant on notice that the volcanic cinders were barren.

The trial record also reveals that Defendant was fully aware that the Flahertys had no rightful claim to cinder reserves. Defendant and her husband breached repeated contracts

they entered into regarding the disputed cinder reserves. Although they managed to gain title to certain parcels from Terrence Reidhead for a short period of time, the Flahertys subsequent default resulted in bank foreclosure on the property. Furthermore, any mining claims extracted from their dealings with the Reidheads did not entitle the Flahertys to volcanic cinders. The Defendant and her ex-husband's plans to remove cinders from those sites were abandoned when they were later challenged by the Forest Service. Therefore, except for a brief period of time from November 1994 to September 1996, Defendant was fully aware that the Flahertys had no valid claim to any cinder reserves.

The trial record similarly reveals that Defendant was aware that the conspirators did not possess the technology to extract minerals from cinders that they advertised. Defendant was actively involved in the management of the conspirator's enterprise for almost a decade. During that time, the record demonstrates that she was aware of how the purported technology to extract minerals was described. For example, investors were originally told that Robert Flaherty had developed the technology; in 1993, the technology was attributed to Dan Reeter; in 1994, Don Nooe was given responsibility; finally, in 1998, Robert Flaherty and Lynn Burr were again credited with the technology. Defendant was clearly aware of each of these changes, and her claims that she had a good faith belief the group possessed the purported technology is untenable. Defendant was also fully aware that Phoenix Metals never produced any precious metals on a commercially viable basis. Despite these facts, Defendant and her co-conspirators represented to numerous investors over several years that commercial production of the metals had begun or was imminent. Therefore, Defendant again fails to establish any credible good faith belief as to the existence of mineral extracting

technology so as to remove her intent to defraud.

Defendant's attempt to reconstruct the trial record in a manner that supports her defense theories is based on a one-sided and incomplete reading of the evidence. The witnesses and documents introduced at trial overwhelmingly demonstrate that Defendant was actively involved in the fraudulent scheme and fully aware of the false nature of the representations used to lure potential investors. Accordingly, a new trial is unnecessary.

**C. The Court Properly Instructed the Jury Regarding Materiality**

Defendant also contends that the Court failed to properly instruct the jury regarding materiality. Materiality is an element of securities fraud, mail fraud, and wire fraud. In the context of securities fraud, materiality is measured by the reasonable investor standard: a fact is material if "there is a substantial likelihood that a reasonable investor would consider it important in his or her decision making." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

At the conclusion of trial, the Court instructed the jury with regard to Counts One and Two that the government bore the burden of proving that Defendant and her co-conspirators made misrepresentations or omissions of material fact. With respect to securities fraud, the Court instructed that: "Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision." With respect to the conspiracy count, the Court instructed: "As discussed with regard to securities fraud, the underlying fraud must be material. A false promise, statement or representation is material if it is made to induce action or reliance by another or has a natural tendency to influence or is capable of influencing another's decisions." These instructions cohere with the principle of materiality articulated by the Supreme Court and

Ninth Circuit. *See United States v. Gaudin*, 515 U.S. 506, 509 (1995) (holding that a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it is addressed"); *United States v. Halbert*, 712 F.2d 388, 390 (9th Cir. 1983) (affirming jury instruction: "The test for determining the materiality of a false statement, representation or promise is whether it is made to induce action by another. In other words, does it have a natural tendency to influence or is it capable of influencing another's decisions?").

While the Court did not employ the language proposed by Defendant, it properly instructed the jury with regard to materiality in Counts One and Two.

**D. The Court Properly Denied Defendant's Motion for a Mistrial**

Defendant also seeks a new trial because the Court failed to grant her motion for a mistrial. During trial, the prosecutor commented on Defendant's retention of private counsel and the expense associated therewith. Defense counsel objected and the Court sustained the objection, ruling that this line of questioning was improper. The Government subsequently abided by the Court's ruling. This improper question by the Government does not provide valid grounds for a mistrial or a new trial. "Generally, when evidence is heard by the jury that is subsequently ruled inadmissible . . . a cautionary instruction from the judge is sufficient to cure any prejudice to the defendant." *United States v. Escalante*, 637 F.2d 1197, 1202-03 (9th Cir. 1980). *See also United States v. Parks*, 285 F.3d 1133, 1141 (9th Cir. 2002) ("the court sustained [defendant's] objection . . . and admonished the jury to disregard the statement. A jury is presumed to follow a curative instruction. We perceive no abuse of discretion in the trial court's denial of [defendant's] motion for a mistrial"). Therefore, the

Court properly denied Defendant's motion for a mistrial, and this denial does not provide any grounds for a new trial.

## II. <u>Supplemental Motion for New Trial: Newly Discovered Evidence of Mental Incompetence</u>

In her Supplemental Motion, Defendant's newly retained counsel additionally contends that recently discovered evidence warrants a new trial. Counsel specifically claims that since the verdict he has discovered that Defendant suffers from significant mental incompetence. Federal Rule of Criminal Procedure 33(b) authorizes a new trial in these circumstances when the moving party shows: (1) the evidence is newly discovered; (2) the failure to discover the evidence sooner did not result from the defendant's lack of diligence; (3) the evidence must be material to the issues at trial; (4) the evidence may not be cumulative or merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal. *United States v. Jackson*, 209 F.3d 1103, 1006 (9th Cir. 2000).

After her conviction, Defendant retained new counsel, Mr. Ellis, as co-counsel for sentencing. Mr. Ellis immediately had Defendant evaluated by a psychiatrist, Dr. Susan Fiester, who subsequently recommended that Dr. Wilfred Van Gorp perform neuropsychological testing. The results from these tests purportedly show that Defendant suffers from a low IQ and significant cognitive impairments. Defendant's new counsel argues that these mental defects are newly discovered and negatively affected Defendant's ability to exercise judgment, participate in her defense, conform her conduct to the law, and form the requisite intent to defraud.

Dr. Van Gorp administered a comprehensive neuropsychological battery and reported

that Defendant's results were consistently low, falling in the range of borderline intelligence. For example, his tests show that Defendant's full-scale IQ is 73. The report also states that Defendant scored extremely low on tests that evaluate achievement, scoring in the borderline range for reading. Dr. Van Gorp characterized her neuropsychological profile as "grossly abnormal" and concluded that she is "a naive individual with borderline intelligence with superimposed cognitive impairments that extend beyond this limited IQ. She is concrete and inflexible in her thinking. Persons with this level of intellectual challenge usually require some direction from others and typically function at lower-level jobs." Ex. A to #228 at 8. This "newly discovered" evidence of mental incompetence, clearly produced for purposes of avoiding judgment, is biased and unreliable. Indeed, it runs afoul of the substantial record of the case. Therefore, it does not provide valid grounds for a new trial.

**A. The Medical Reports of Incompetence are Suspect**

The reliability of Doctors Fiester and Van Gorp's reports is suspect. Bypassing numerous psychiatrists and psychologists nearby, Defendant employed two doctors from the East who are particularly known to the criminal defense bar for producing favorable opinions and diagnoses. Given Defendant's obvious motivations in retaining these professionals and the doctors' history of testifying favorably for similarly situated criminal defendants, the opinions of these doctors should not be relied upon as "newly discovered evidence" mandating a new trial.

It is no accident that Defendant chose Dr. Fiester and Dr. Van Gorp among all the available mental health doctors in the nation. Both individuals have been extremely active in testifying for criminal defendants across the country. Dr. Fiester, for instance, admits that she

has participated in more than 700 forensic cases. A quick case search reveals that both doctors have testified in literally dozens of cases that criminal defendants of all types possess mental and/or behavioral problems that caused the underlying criminal behavior. *See, e.g.*, *United States v. Rouse*, 168 F.3d 1371 (D.C.Cir. 1999) (in support of defendant's motion for new trial based on "newly discovered" evidence, Dr. Fiester testified that defendant's fraudulent criminal activity and money laundering was attributable to abusive relationship with codefendant); *Bryant v. State*, 393 Md. 196, 900 A.2d 227 (Md. 2006) (Dr. Fiester's proffered testimony that murderer had an "impulse control disorder" not allowed); *Orndorff v. Commonwealth of Virginia*, 628 S.E.2d 344 (Va. 2006) (Dr. Fiester testified on behalf of murder regarding "dissociative disorder not otherwise specified"); *Attorney Grievance Commission of Maryland v. Childress,* 364 Md. 48, 770 A.2d 685 (Md. App. 2001) (recounting Dr. Fiester's trial testimony that attorney convicted of using internet to solicit sex with young teenage girls suffered from an "obsessive compulsive disorder"); *In re. Woodard,* 636 A.2d 969 (D.C. Cir. 1994) ("after coming up short in the 'battle of experts,' Respondent located a psychiatrist with a new theory," Dr. Fiester, who opined that attorney respondent's "unethical professional behavior was the result of a complex diathesis of psychological and psychiatric factors"); *The Tech*, January 19, 1994 ("Psychiatrists dueled in court Tuesday over whether Lorena Bobbitt cut off her husband's penis under an 'irresistible impulse' . . . . Dr. Susan Fiester, a $210-anhour defense expert . . . testified that a 'brief reactive psychosis' triggered by a marital rape left the 24 year old manicurist unable to resist mutilating her allegedly abusive husband"); *Orndorff v. Commonwealth of Virginia*, 628 S.E.2d 344 (Va. 2006) (Dr. Van Gorp (together with Dr. Fiester) testified on behalf of murder regarding

"dissociative disorder not otherwise specified"); *People v. Goldstein*, 6 N.Y.3d 119, 843 N.E.2d 727, 810 N.Y.S.2d 100 (N.Y. 2005) (Dr. Van Gorp testified for defendant to the effect that the defendant suffered a "transient episode of extreme psychotic symptomology"); *State v. DiFrisco*, 174 N.J. 195, 804 A.2d 507 (N.J. 2002) (defendant who admitted murdering another person for $2500 payment introduced Dr. Van Gorp's report that defendant suffered from Attention Deficit/Hyperactivity Disorder (ADHD)).

Dr. Van Gorp was also famously involved in the defense of Vincent ("The Chin") Gigante, the notorious boss of the Genovese family in La Costra Nostra who spent decades roaming Manhattan in his bedclothes and slumbering in coherently. After a thorough examination similar to the one administered on Defendant in this case, Dr. Van Gorp concluded that Gigante suffered from severe dementia. The District Judge in that case rejected Dr. Van Gorp's proposed testimony as "unreliable" and "not consistent with other evidence" in the case. *United States v. Gigante*, 982 F. Supp. 140, 147-48 (E.D. N.Y. 1997). Later events revealed that the District Judge was correct in rejecting Dr. Van Gorp's assessment as Gigante later revealed that he had "deceived the teams of psychiatrists who had evaluated his mental competency from 1990 to 1997 and found him to be suffering from various forms of dementia." A. Newman, *Analyze This: Vincente Gigante, Not Crazy After All Those Years*, N.Y. Times, April 13, 2003.

The Gigante case exemplifies the dangers of relying on medical observations that contradict other known conduct of the defendant, especially this late in the proceedings. Granted, the fact that Dr. Fiester and Dr. Van Gorp are well-paid experts working for the Defendant does not alone discredit their testimony. However, their reports and conclusions

must be examined in light of their motives, bias, history with the criminal defense bar, and, most importantly, the other evidence regarding Defendant in this case. The considerable evidence produced in this case during discovery and trial does not comport with the picture painted by these doctors' new reports.

Dr. Van Gorp states low cognitive test scores reveal that Defendant's neuropsychological profile is "grossly abnormal" and "[p]ersons with this level of intellectual challenge usually require some direction from others and typically function at lower level jobs." Ex. A to #228 at 9. This conclusion is offered to support Defendant's new theory that she was incapable of forming the intent required to participate in the conspiracy and fraudulent schemes. However, in addition to the inherent bias in Dr. Van Gorp's work, his reports seem to possess several methodological weaknesses. For example, the tests failed to adequately take into account the fact that Ms. Flaherty is a Taiwanese immigrant whose native tongue is Mandarin, not English. Her poor performance on intelligence tests asking questions about American history and European literature and culture can thus be easily explained by her foreign upbringing. Additionally, Dr. Van Gorp notes that Defendant's low IQ score (73) "is somewhat invalid because it is made up of both culturally weighted English language subtests as well as nonverbal subtests . . . Her verbal comprehension index . . . was no doubt largely affected by English and cultural factors." Ex. A to #228 at 4-5. Review of the testing materials reveals that all of the tests, both verbal and nonverbal, were administered in the English language and made no accommodation for the fact that Defendant was born and schooled in Taiwan. Therefore, these results should be treated with suspicion.

Dr. Van Gorp's conclusions also do not fit with the other evidence regarding Defendant's behavior in this case. Defendant's life history reveals a woman who was actively engaged in making key decisions in her life. For example, Defendant opened a retail jewelry and gift kiosk with an ex-husband, worked in the wholesale business for five years, divorced her first husband and moved to Los Angeles by herself, worked as a loan broker, married Robert Flaherty despite discovery that he was a pathological liar, and served as a key officer in Flaherty's business activities. Relevant to the current case, Defendant took an active role in managing the Flaherty business entities, procured assays of ore andore solutions, directed the corporation's promotional activities, and personally made several misrepresentations to investors in both the English and Mandarin languages. Defendant even stated to Rudy North that she has been "running the business all along." These facts do not harmonize with Dr. Van Gorp's picture of a "naive" individual who "usually require some direction from others and typically function at lower level jobs."

Defendant's active involvement in her legal defense also is at odds with Dr. Van Gorp's conclusions. Ms. Flaherty has actively participated in this case from the outset. The Court observed her involvement during trial and throughout the other stages of the case. Her active role in the case does not support Dr. Van Gorp's picture of a borderline mentally incompetent individual.

**B. The New Evidence Should Have Been Discovered Previously and Would Not Result in Acquittal**

To prevail on her motion for a new trial, Defendant must also show under Rule 33(b) that the Defendant's failure to discover the evidence was not due to their own lack of

diligence and that the new evidence would likely result in an acquittal if it had been admitted at trial. Defendant fails to meet her burden of proof in both respects. First, if Defendant truly suffered from the degree of mental incompetence that her experts describe – and that would justify a new trial – then it is highly dubious that Defendant and her counsel failed to discover it until the eve of sentencing. Even taking Defendant's English language difficulties into account, such extreme mental defects would surely have manifested themselves to Defendant and/or her counsel much earlier. Defendant had opportunities throughout her life and during trial preparation to undergo mental health testing and treatment. She never availed herself of these opportunities. Instead, she hired two notorious criminal defense experts, located across the country and retained only as part of this litigation, as part of a last ditch effort to avoid judgment. Given the history of these doctors and the inconsistency of their reports with the known conduct of the Defendant, their opinions cannot be relied upon as newly discovered evidence justifying a new trial.

The Defendant has also failed to demonstrate that the newly discovered evidence would have resulted in acquittal at trial. Defendant argues that her incompetence demonstrates that she was incapable of forming the criminal intent necessary for her conviction of fraud and conspiracy. However, courts warn against using psychological expert conclusions, especially late in the case, to negate a showing of criminal intent. In similar procedural circumstances, the Ninth Circuit rejected a habeas corpus petition that relied on post-trial psychiatric opinion that the defendant suffered from a mental defects which demonstrated he was incapable of forming the requisite criminal intent. *Griffin v. Johnson*, 350 F.3d 956, 964-65 (9th Cir. 2003). The court noted that

> Because psychiatrists disagree widely and frequently on what constitutes mental illness . . . and because a defendant could . . . always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion[,] we have stated that it is clear that the mere presentation of new psychological evaluations . . . does not constitute a colorable showing of actual innocence.

*Id.* (internal quotations and citations omitted). The trial record clearly demonstrates that Defendant was guilty on all three Counts of the Superseding Indictment. Defendant was actively involved in the fraudulent activities of Robert Flaherty and his corporate alter ego's and co-conspirators. Witnesses testified that she personally made material misrepresentations regarding the volcanic cinders. The jury unanimously reached a guilty verdict. Given this clear showing of guilt, Defendant's attempts to eliminate her criminal intent through the opinions of recently hired psychiatrists must be rejected.

Defendant has failed to demonstrate that the newly discovered evidence of her mental incompetence is reliable, could not have been discovered previously, and would have resulted in acquittal if admitted at trial. Indeed, the great weight of the evidence seems to contradict the findings of these mental health doctors. Therefore, Defendant's Supplementary Motion for a New Trial should be denied.

**CONCLUSION**

IT IS HEREBY ORDERED that Defendant's Motion for a New Trial (#181) and Supplemental Motion for a New Trial (#228) are *denied*. The great weight of the evidence supports the jury verdict. The jury was properly instructed regarding materiality. Finally, the newly discovered evidence of mental incompetence appears unreliable and should not be relied upon.

DATED: March 20, 2007.

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE